We'll now hear United States v. Torres. We have Ms. Baumgartel for Mr. Torres. I see you reserved your two minutes for rebuttal so you can begin whenever you're ready. Good morning, may it please the court. Sarah Baumgartel of the federal defenders on behalf of Aquilino Torres. This court should order a new trial on Mr. Torres' kidnapping convictions because his defense of those charges was prejudiced by the district court's erroneous admission of inflammatory and improper 404B evidence, including the testimony of one of Mr. Torres' prior girlfriends about injuries in an incident that occurred seven years earlier, 200 some pages of her medical records, and a transcript of Mr. Torres' prior guilty plea that included a variety of inflammatory and prejudicial information that had no proper purpose in this trial. The district court had two purposes. One was the knowledge of your client as to whether or not he was knowingly detaining the victim. The other was as to the state of mind of the victim. So why don't we take those each? Why isn't it important if your client is contesting knowledge? I didn't know, and especially where there were times where he left the apartment, right, and went on errands, right? So why isn't it important for the government then to be able to say, well, he did something before where he pled guilty to knowingly detaining someone that was very similar to this? So he very well understood how this would be interpreted by the victim in this case. Why isn't that important on knowledge? So Mr. Torres did not previously plead guilty to knowingly detaining someone in connection with- What was the guilty plea to? To assault. To assault. He admitted only that he had assaulted Ms. Rosario and- Did she testify, right? Did the prior victim testify? She testified at his current 2020 trial, but she did not testify in the prior trial. In the prior trial, it was a plea. Right, but as far as conviction, that goes to the knowledge. The argument is that it was the effect of his conduct on Ms. Rosario shows his knowledge that the effect of similar conduct here would have on the victim in this case. So the current charge is a kidnapping charge. With respect to Ms. Rosario, her allegations were that Mr. Torres physically bound her in a room, taped her mouth shut, and barricaded the door shut so that no one could come in. I submit, to the extent that shows knowledge of a kidnapping, it is extremely different than Ms. Nett's allegations. And that's an important difference and a reason why this was not sufficiently similar for a non-propensity purpose. Ms. Nett alleged something that was very far from a conventional kidnapping, although she repeatedly lied about what happened prior to trial. By the time of trial, the government's theory was not that Mr. Torres had ever physically restrained her. She had been living in a homeless shelter because she did not have a place to live. She went out to willingly meet with Mr. Torres, with whom she was in a relationship with. They went to a rented room that they had previously stayed in numerous times before. She was the person who rented that room. She was the person between the two of them who had more income. She had her cell phone. Just remember, so the core of your argument is that the prior victim was tied up and physically restrained. And so conduct that doesn't look like that, can't tell us anything, isn't probative of knowledge or intent where you don't have physical restraint. I think that's the sharp edge of your argument. Yes, Your Honor. That's one part of our argument. But it's also, you know, I challenge the court to explain how the prior incident shows knowledge of the current incident without a propensity inference. And I think it is useful to analogize to some of this court's drug cases where they've dealt with 404B evidence, where this is really the heartland of the sort of prior act evidence that should be excluded. Because what you have is you have an allegation that is sufficiently similar in the sense that it's in the same category of bad act, so that it strongly suggests criminal propensity. But it doesn't have some of the critical characteristics that would make it relevant for a non-propensity purpose. Let's talk about the state of mind of the victim. According to her testimony, he told her, at least in part, not all the details, about this prior incident during her period of captivity. So when you're making the argument, I think, that you were making here, which it was also made at trial, whereas this is a different type of kidnapping where she wasn't restrained and he left her, why isn't that then critical as part of the information that the victim considered in deciding not to leave? Because she was concerned- He didn't object to that testimony.  No, and that's actually- That's the point. That's an important point. So it's important not to- That is probative. What he told her is probative, but all of the other evidence about what occurred, medical evidence and the like, doesn't go to what she knew because the uncontested record is she didn't know. That is our point, yes. But why isn't the government entitled to corroborate that? If you're arguing that she's lying about everything, potentially including, I know you say you crossed her on that. No, we did not cross her on that. I don't know, but in the closing, this was the opening line of the closing. It was a dramatic tale told about what happened to her, snatched off the street, forced into a car, hands tied above her head with string, held hostage, and it goes on and on. It says it was dramatic and none of it was true, none of it, though it was all made up with her words. It had the intended effect. Mr. Torres ended up in federal court, charged with kidnapping, stalking, crimes he did not commit. So this is a full-scale assault on the credibility of the key witness in the case, and why shouldn't the government then be saying we're going to corroborate that? When she says he told her this, she didn't make that up because this, in fact, happened exactly along the lines of what she said he told her. Well, so there are a couple of important answers to that. One thing is actually the defense was very careful never to challenge those statements because we were not opening the door to this. Isn't that an overall challenge to everything she said? No, not at all, Your Honor. Everything she said is a lie? Everything she said is a lie, doesn't entitle the government to corroborate what they think is a key part of proving their case and why she didn't leave even though he was not there? So that statement was never challenged, and so that's one answer. The second answer is no. There's always a Rule 403 inquiry of whether the probative value of this is outweighed by the prejudicial effect, and here there were many undisputed text messages between the two and many other statements and frankly threats, as the government characterized them, that Torres made to her that were sufficient, that would not have made it necessary to corroborate this single threat in the context of so many other things. When you weigh that against the prejudice inquiry, it's very clear that this was more prejudicial than probative. So you just don't think that portion of the victim's testimony about him telling all those things was significant enough for the government to be able to corroborate it? That's essentially what I think you just argued, no? Well, it's a 403 inquiry, so is the probative value of corroborating the single statement outweighed by the prejudicial effect? And the answer is no. One thing, by the way, she said that he said that he had stabbed the mother of his children. That was never testified to, so in fact that wasn't corroborated by Ms. Rosario. The other statements that he had held her without releasing her, even if the government wanted to corroborate those statements, that doesn't provide a basis to put in all of the extraneous prejudicial information that they did, including 200 pages of her medical records documenting severe injuries. The statement that he had beat Ms. Rosario around- They said they never referenced those. They were put in, but they say they didn't reference those. I guess the jury never had them, so- The jury did have them. They went to the jury room. It's documented in our brief, but all of the exhibits were sent back to the jury. That is the district judge's practice. And so they were given to the jury. There were also specific parts of it, Your Honor, including that they elicited that Mr. Torres told Ms. Rosario he was going to give her an at-home abortion while beating her about the stomach. These were all details of the prior incident that Ms. Nett did not claim any knowledge of. Did he say similar things to this victim, something along those lines? I thought I read somewhere- That he was going to- Something about her child, along those lines, but I may be mistaken about that. It may have gotten me fooled. Your Honor, there was nothing- Something about that line that was similar to what was said to the victim. There was a text message on 10-5 before, while Ms. Nett was in the shelter and Mr. Torres was somewhere else, where he said that he was going to kick her son's teeth out. That was in the text message. I did want to ask about sentencing because we haven't had enough categorical approach discussion this morning. But first, thinking about the concurrent sentence doctrine, I find the Vargas factors confusing with respect to sentencing and how to apply them. But here, the unchallenged conviction is a mandatory 20-year term. So it's difficult to see- Is that wrong? No, Your Honor. We're challenging Count 1 and Count 2. Oh, I'm sorry. So Count 1 and Count 2 are the kidnapping. Kidnapping has a mandatory 20-year minimum for Count 2. We're challenging the sentence on Count 3, which has a 20-year statutory maximum. Right. At least when I think about if there should be a concurrent sentencing doctrine applied, I would think a place to apply it is where there is literally no chance of the overall sentence being affected. And we have that here, I think, even though it's not a life sentence like some of the cases we see, where the unchallenged conviction produces a mandatory term of the same or longer length. Your Honor, we are challenging Counts 1 and 2. And so if the court agreed with our arguments on the Rule 404B, that would be vacating Counts 1 and 2, so there would not be any sentence that had a mandatory. With respect to Count 3, that's the count we're arguing about the sentence. And what I would say of that is just that the court typically has applied it where there is mandatory- Okay, I'm sorry. So just let's assume your conviction challenge fails and we're just dealing with sentencing. In that case, I think my framework applies, which is even if you're right about the sentence here being above the appropriate maximum, the overall sentence can't change because you have standing convictions that include a mandatory sentence of equal or greater length. Your Honor is correct that if Counts 1 and 2 are upheld, the overall sentence doesn't change. What I'd say about that is with respect to the Vargas factors, they look at reasonable certainty that the length of sentence will never have any effect. And there are other effects. There are essentially collateral consequences to the length of sentence. When you have someone who's convicted of something carrying mandatory life, you can say with fair assurance that these collateral consequences are not going to be significant. But when you have someone who's going to be serving 20 years in prison, they are- or the unchallenged count of conviction is a life sentence. It's a mandatory life sentence. You would limit- Yeah, Your Honor, it's a discretionary doctrine to start with, and I think it would make sense because that is a time when you can say- How can the collateral effect be different here? You're not challenging the underlying conviction on stalking, so it's not as if the stalking conviction would go away. The sentence would be reduced if you were correct on that from 20 years to 10 years, right? Yes. And that would also have no effect on the overall prison term. What different collateral effect does that have on your client if that sentence gets reduced from 20 years to 10 years? I just don't understand. Can you articulate how that could help him somewhere? Some of the Vargas factors talk about whether a later conviction can be used for impeachment purposes, which depends on the length of the sentence. It talks about whether collateral consequences, including relief from disabilities, which can sometimes hinge both on the length of sentence for the conviction itself. So when you're being impeached with a conviction, it depends on the length of sentence for that particular conviction, not on the overall length of sentence that you receive. That seems an argument that essentially there shouldn't be a collateral sentence doctrine because I'm not sure how that would ever not be the case. I mean, I suppose if it's not a doubling of the potential length of term but increased by a year or something like that, although I suppose you could still theoretically make those arguments. But so then turning to the merits of the sentencing challenge, so you argue below that because the state count here is assault that he pled to didn't include the fact of who the victim was. There's that fact that the victim, Ms. Rosario, was a girlfriend and therefore would constitute some sort of domestic violence offense needed to go to the jury. Your Honor, we argued that the recidivist sentencing enhancement could not apply because the government had not met the criteria for applying it and that his maximum was 10 years. And yes, one of the legal arguments that we made in support of that was that the government, by attempting to apply it, was depending on facts that had not been proven to the jury. So factual circumstances for the prior conviction. And so I understand the government argues that we've not sufficiently preserved that. I think that we have by raising that claim and we can now advance additional legal arguments in support of that. And the argument now is 2265A is a categorical match. It has to be a categorical match with the state assault law. I mean, it's plainly not, I think. That is our argument. And also we haven't abandoned the district court argument to the extent that the government is relying on additional facts because they say that it's not a categorical match. If it's a categorical match, you prevail and the sentence would need to be vacated. It's not a categorical match. I mean, it ends up being sort of the same analysis, but if it's not, you prevail because an element wasn't originally pled to or found by a jury. Yes. I see that my time has run out. Thank you. Thank you very much. We'll now hear from the government. Mr. Trohles. Good morning, Your Honors. May it please the court. My name is David Robles. I'm an assistant United States attorney in the Southern District of New York. I represent the government on this appeal as I did at trial. I want to start by clarifying a point that my adversary was making in response to Judge Bianco's question about the challenges to the victim's credibility overall  about what he had done to the prior victim. It is true. The lead defense was that the victim was a liar, that Ms. Nett was a liar. But the defense also specifically challenged the statements that Mr. Trohles made to Ms. Nett. That's at page 1092 of the transcript of the record. In summation, the defense specifically said, quote, Lo and behold, Ms. Nett comes up with a story that Mr. Trohles is actually talking about the things that happened eight years ago while in the bathroom. Like, that never happened. That's a specific challenge to Ms. Nett's testimony that Mr. Trohles told her what he had done to the mother of his children. There's also a suggestion in the briefing that Ms. Nett, there's no evidence in the record that Ms. Nett had any prior knowledge, separate and apart from what Mr. Trohles told her about the prior incident. That's also inaccurate. Pages 616 and 617 of the record, the defense, in fact, brought out on cross-examination from Ms. Nett's mother that Ms. Nett's mother had heard rumors about what the defendant did to the mother of his children and that she had spoken to Ms. Nett about that. So there's evidence in the record that Ms. Nett knew about the prior conduct and there's evidence that the defense was actually challenging the statements that Mr. Trohles made. And so this was allowing evidence of the prior conduct was not only properly admitted as 404B evidence, it was properly admitted as direct evidence in this case. It was Mr. Trohles himself who made the prior conduct inextricably intertwined with the charged conduct by using it as a means to intimidate and threaten the victim and force her not to leave. In fact, while he was beating her in the bathroom just before he raped her next to her seven-year-old son, he was telling her what he did to the mother of his kids. And then after that, he told her multiple times throughout the course of the kidnapping, quote, don't do anything stupid. So I can see why, without a doubt, what he told her and what she knew about what had occurred with Ms. Rosario is probative. I think in my mind the question then is why all the evidence that goes beyond what he told her and what she knew. And I think your argument is because the defense contested the veracity of whether Torres told Ms. Nett. Do I have that right? That's right in part, Your Honor. Your Honor, it also corroborated what Ms. Nett said, because the fact that he had actually committed evidence showing that he actually did the things that he was threatening. But if it was only for that purpose, their argument is, and I think this is along the lines of Judge Nathan's question, that the amount of proof the government would need to corroborate that the victim was told this would have been at a lesser level than what the government sought and what the judge admitted, including medical records and a lot more details during the testimony of Ms. Rosario that weren't told to Ms. Nett, right? I understand the argument, Your Honor. Why isn't that a problem? If you're only relying on that, I understand the government's relying on the defendant's knowledge, and presumably then you should acknowledge more detail would be relevant, although they have a different argument on that, that it's not similar enough. But if it was only for purposes of intent of the victim, state of mind of the victim, why would you need so much detail? Your Honor, respectfully, that would be when it's properly admitted as direct evidence. I think that there were two separate reasons why the government sought admission of this evidence here. All right, so can you talk about the knowledge of the defendant? If in the prior incident she was tied up, there's a different type of detention than was testified to here, why doesn't that make it not particularly probative on his knowledge? Your Honor, here there were some differences between the past conduct and the charged conduct, but of course, as the court knows, when the government is seeking to admit prior acts evidence to prove knowledge or intent, the conduct doesn't have to be identical. Judge Cote correctly noted that. Right, but here it seems like, and it's always a bit of a fine edge, but here I think the best argument that the government has, and what I understood the district court to be saying, is if he knows that certain conduct will cause a victim to feel restrained, then that's relevant to whether he knew that his similar conduct here would make her feel restrained. But if the conduct is the prior victim was tied up and physically restrained, then that can't go to the jury. The judge didn't let it go to the jury. Defense can't bring that out because all it does is make a bigger prejudice problem. So you've got, doesn't that dissimilarity, that substantial dissimilarity, undermine that sort of thin string of probative value because the conduct isn't sufficiently similar? Your Honor, respectfully, I don't think it does. I don't think there was evidence in the record that the prior victim was tied up during the entire duration of the kidnapping period. There's no evidence in the record that the prior victim had her mouth taped shut for the entire period. Here, Judge Cote carefully and thoroughly went through the similarities between the charged conduct and the past conduct, including that it was conduct against romantic partners, that the defendant confined both of them in an apartment, that he physically and sexually abused each one of them, that he threatened the lives of both of their children. The prior victim, he threatened to give her an at-home abortion. And in this case, not only did he threaten to kick the victim's son's teeth out through text messages, while he was beating the victim in the bathroom, he told her that her son's body would be found in the river the next day, immediately after he told her what he had done to the mother of his children. The defendant in both cases also controlled their access to food. In both cases, after the victims escaped, he threatened and harassed them with call after call, even tried to go looking for them at the various hospitals that they were at. And so here, unlike the cases that were cited in the defense briefing, cases like Zhang and Curley where the prior act evidence was found to be, the admission of the prior act evidence was found to be not sufficiently similar because they involved conduct of a completely different character. What you have here is just two kidnappings, two violent assaults that looked very much alike. Yes, the prior kidnapping had certain aspects of it that were perhaps more egregious. But as Your Honor noted, none of that went before the jury, and that was intentional. The government suggested that, and Judge Code carefully looked through the evidence and decided that limited 404B evidence that goes to the defendant's knowledge and intent was properly admitted in this case. And I'll note, just with respect to knowledge or to the proper purpose that this was being used for, the defendant knew, and the government argued specifically, that the defendant knew based on his past conduct that what he was doing was wrong, that his victims weren't there with him voluntarily. In fact, there's evidence in the record of the defendant sending a text message to his sister after the victim in our case escaped saying, quote, she must have told them everything. I know for a fact that what they're going to charge me with is a felony. He knows that because he's been charged with felonies for substantially similar conduct in the past. What about the medical records? Doesn't that go well beyond what the government would need for either of these purposes to put in the prior victim's medical records? Your Honor, we sought to admit the medical records because they, in part, explained what happened to the prior victim. It corroborated her testimony about what happened. We think they were probably— Was Ms. Rosario's credibility on what happened in question? Your Honor, they did not cross-examine her on that, but when the medical records were admitted, of course, the defense hadn't summed up. We didn't know what they were going to say in summation about her credibility, and so we submitted the medical records, we think, not only because they were relevant. And I'll note for the Court, the parties had multiple discussions and went back and forth on the appropriate redactions for those medical records that were admitted. I understand that the defense had a broad objection to any 404B evidence coming in, but there was extensive back and forth, as reflected in the transcript, about the redactions that would go to the jury, or the redacted records. Can I spend a minute on the sentencing issue? I do, Your Honor. Of course, it's the government's position that the Court should affirm counts one and two. Count two, which was the kidnapping of a minor charge, had a 20-year mandatory minimum sentence. And if the Court does affirm those, then it's our view that the concurrent sentence doctrine squarely applies here. Resentencing on count three, from a 20-year to a 10-year – potential to take it from a 20-year sentence to a 10-year sentence would have absolutely no effect on the time that he spends in custody, nor do we think that there are any adverse collateral consequences that the defendant would realistically face if his convictions on counts one and two stand. So, I mean, it's hard to figure out when you're in a post-Ray context, when you're only talking about the sentencing. As I said to Ms. Baumgartel, it's hard for me to make sense of the Vargas factors in that context. But it's hard to see why that wouldn't always apply where you've got an unaffected sentence that's of equal or greater length. Right, and I think, Your Honor, the – We don't see that – we don't see the – in the cases, you don't see that frequent in application of the doctrine. I understand, Your Honor. And I note that the doctrine has been applied most recently when there have been life sentences, but we don't think there's any meaningful distinction between the cases that involve – or I apologize. I don't believe that this court has ever said, or any court has ever said, that the concurrent sentence doctrine can only apply in the context of a life sentence. Here, I'm not sure that we can come up with any collateral consequence that the defendant would face if his convictions on counts one and two – What's the government's position if something were to come up five years from now where there was some collateral consequence, unexpected, could he then try to litigate this at some future time, or the government would argue it's too late? Your Honor, I think – Because I think there are some cases that sort of we've opened that possibility. Maybe I'm wrong about that. I think perhaps the defendant would have an argument in the 2255 context and could raise some of these arguments, but I think – I would expect the government would also bring up the concurrent sentence doctrine as a potential defense there as well. Right. But if there were another trial and they were trying to offer this and there was some effect that this had, some of the things that pointed to as hypotheticals, there would be at least some possibility then you could come back and argue, wait, I should have this looked at on a 2255 or something or not? I think – I don't know the answer to that question, Your Honor. Or if the kidnapping convictions were later impacted in some way so that the premise for application of the doctrine evaporated. There are cases that sort of suggest, well, you can deal with that down the road, although it's a bit head-scratching as to what procedural vehicle would permit that. I would agree with Your Honor. And then on the merits of the sentencing contention, I mean, it seems like it is right that there's an element required for 2265A, namely who the victim is, that wasn't pled to in the state conviction here. Well, Your Honor, respectfully, the 2265A is purely a recidivism statute. It's not a statute like in Alain and Haines, the cases that were cited in the briefing that involved – I apologize. It's a purely penalty provision. It doesn't involve the government to prove anything at trial. The cases that have talked about sending – having to prove something to a jury that impacts a sentence are cases where the fact that needs to be proven is part of the offense of conviction. I think in – you see them in the 924C context, and in Hayes it had to do with whether – But this sentence would only qualify under 2265A if it were a conviction for domestic violence. This was an assault conviction. Factually, it could have been charged and pled as a domestic violence conviction, but it wasn't. And I think here, Your Honor, our view is that to the extent that – because 2265A is not part of the offense of conviction, it's not the fact of the prior – But it changes the statutory maximum for punishment. So it's, I think, squarely in the Apprendi line, and what takes it out of the Almendares-Torres exception is that it's not just the fact of conviction that would establish it here. Isn't that right? I disagree respectfully, Your Honor. I think that here, Almendares-Torres would squarely apply. It's a fact of a prior conviction that we don't think – we don't believe should go. So could you take the fact of a shoplifting conviction to use that to establish a 2265A enhancement here? I think it depends on – no, I don't think you could. Why not? It's just the fact of conviction. Your Honor, I think it would have to qualify as a prior domestic violence. Based on the elements. In part, yes. Yeah. Thank you. Thank you. Thank you, Your Honor. I just want to start with a state of mind point with respect to Ms. Nett. And I just want to make the point that the government's citation to our challenge to Ms. Nett's state of mind or challenge to the veracity of these statements was in the defendant's closing argument. At that point, we've objected to this evidence repeatedly, and it's all come in. And so at that point, we have to deal with the evidence as the judge has admitted it. And so I don't think that the government can use that to bootstrap to say that that provided a basis for the judge to admit the evidence in the first place. Throughout the actual course of the trial, as we were objecting to this – Is there a law for that proposition? It's sensical, but I'm not familiar with cases that don't look at how it's used in part to – how it's used at summation in part to assess whether it should have come in in the first place. Well, I don't think that there's a case – I'm not aware where there's a case where the defense objects to evidence coming in, but then uses it in summation and says that that can be considered. It's very clear throughout the trial. No, you didn't object to her testimony about it, so it is – you didn't object to her testimony about the prior incident coming in, but then you attacked her – not you, but the trial counsel attacked the credibility in the summation. The fact that all this other evidence came in doesn't necessarily mean we had to challenge that. You weren't challenging it coming in? No, but, Your Honor, we did challenge all of the Rosario evidence. So her statements, correct, were not challenged at trial. But then in summation, you said when she made those statements, she was lying. So to me, that suggests that argument would have been made regardless of whether the other evidence came in or not. Maybe I'm wrong about that. Your Honor, I think that – I don't think that you can rewrite this cross-examination to say how – or the closing to say how it would have been if a lot of this other evidence had not come in. All right. And I just – the other point I want to make is that to the extent that any of it was relevant, what was admitted here was substantially more and significantly more prejudicial than what would have been relevant to a proper purpose. And I just want to end on a few cases. The government said that we identify 404B cases where the evidence was of a totally different character. But that's really not correct. If you look at United States v. Curley, United States v. Williams, United States v. Gordon, these are all cases where the prior act evidence was of a similar character, a drug prior conviction for a new drug case, prior possession of guns for a new gun possession case, Curley prior domestic violence and threats for a new stalking domestic violence case. And what the court recognized is that that is where the risk of prejudice from prior act evidence is the most significant and where it has the greatest risk to undermine the presumption of innocence and to corrupt the defendant's ability to get a fair trial on the charges that he's actually facing. So unless the court has any – Could you respond – the point about it being direct evidence, which the district court did adopt to some extent in her oral ruling. So the idea here is that he is using the fact of what he did to Ms. Rosario as part of his effort to keep Ms. Nett in place and restrained. And in that sense, what happened to Ms. Rosario then has significance. I can see the argument. I mean, I suppose your response is that what he told her then is direct evidence of that, and there's nothing beyond what he told her in the government's responses, but we're corroborating to some extent what she said happened. That's right, Your Honor. And I do think the district court actually did abandon that rationale when we renewed our objection at trial and emphasized just the knowledge and intent. And I don't think the district court then maintained that it was direct evidence. The limiting instructions she gave, the paper showed, and I didn't check it, but it seemed like there were two. And in one, she included credibility as part of what they may permissibly consider it for, and in the later one she didn't. That's correct, Your Honor. At the final instruction, the court said state of mind. I believe so to the extent that Ms. During the trial, she said both? I may have it, but I now don't recall. There was a limiting instruction given when Ms. Rosario testified and then a final limiting instruction, and I don't recall exactly what the court said. With respect to the instructions, our point on those would just be that there are cases where it's not sufficient. This course has recognized. But also, we did ask for a much longer and more rigorous limiting instruction, giving the jury more specific information about how they could use this prior act evidence, and the judge declined to give that and gave what I think was a fairly insufficient instruction. All right, thank you. Thank you both for a reserved decision. Have a good day. Thank you. Watson versus. Morning. Mr. Watson, as you know, the other side is on submission, so you'll be the only one arguing today. You have five minutes, and you may proceed when you're ready. Okay, I'm ready. I started getting arrested at about the age of 15 by the Manchester Police Department. They arrested me for walking to school. I said a swear word. I didn't. I was arrested for having a box cutter, and I worked in a factory cutting open boxes. I was arrested approximately ten different times for virtually nothing. When I was 18, the police questioned me about a series of robberies. Then they arrested me. Even after they learned I had nothing to do with the robberies, they arrested me. I ended up being sentenced to five years in prison. Years later, a guy tried to steal my car. I called the police several times. I called him maybe five different times. I told him that the guy was trying to steal my car. He was a friend of my brother's, or he knew my brother. The guy came to my house with a weapon. He got into a fight with my brother. He ended up losing his life at the end of the fight, and the police came up with a story later, and they decided that I should be arrested. They made something up. They said that I smoked marijuana. That was the only thing that they could think to say, so they charged me with possession of a non-quantity of marijuana. They held me, and they detained me for approximately a few days before I made bond. Then after I made bond, I hired an attorney. We went to court, and they were trying to sentence me to prison for approximately a year. They couldn't find out how to put me in prison, so they talked a judge into sentencing me fraudulently. They talked a judge into putting me in prison, so I was sentenced to three years in prison. It was complete fraud. I ended up getting documents that I have here. What they ended up saying, they ended up dismissing the marijuana charge, and the prosecutor was trying to get the judge to sentence me fraudulently. The judge said she didn't want to be involved. She ended up dismissing the marijuana charge. The judge said she would sentence me without any charges because she didn't want to put fake charges on me. She ended up dismissing the marijuana charges. She sentenced me to prison with no charges. There was actually no charges at all. She sentenced me to three years in prison. Then what they later said is that I was on probation, which I was not. I ended up getting a letter in 2020 to show that I was not on probation at the time. They created a fraudulent document to say that I was on probation and that I violated probation and I pled guilty. I did not. This is a fake document. They already admit to everything. William Tong, I've already had correspondence with the state's attorney. They said that the whole thing was caused by the Manchester Police Department. They already acknowledged they were wrong. They said they were going to compensate me, but they said the only issue was that they felt I was asking for too much money. I asked for $5 million, and they said they felt I was asking for too much and they said I should only ask for money for time I was actually incarcerated illegally. I was given two different figures. I spoke to the internal affairs officer at the Manchester Police Department. He stated that the three-year prison sentence was a problem because I was sentenced with no charges. There were no charges. I was not on probation, not on parole, and the only charge was the possession of marijuana, which there was none. That charge was dismissed. So it was such a problem that he said that they were willing to compensate me for the three-year prison sentence, but that's all they were willing to compensate me for. I filed a claim with the Claims Commission. They said they looked into my five-year prison sentence and three-year prison sentence. They said out of the five-year prison sentence, I only served two years in prison, so they were willing to compensate me for two years plus the three years, so they were willing to compensate me for five years, but they didn't feel I should be compensated for anything more than that for five years. But they've already all admitted that I was wrongfully incarcerated twice. I was arrested multiple times illegally and wrongfully, and the only issue was that they felt I was asking for too much money because I asked for $5 million. Mr. Watson, why didn't you bring the case sooner? I think you were pardoned in 2009. Right. Why didn't you bring the case sooner? Right. I was sentenced by a judge, and what they ended up putting down was that I was on probation and that I was in violation of the probation. When I spoke to the prosecutor, she said the sentence was such a problem that she said they brought all Connecticut state officials in on this, and she said to me, we're going to do everything we can to block you from doing anything. So I spoke to many attorneys and state officials, and I was told if you can't prove that you were not on probation and that you violated probation, if you can't prove it, then you have no case. Can you prove it? And I said, well, they blocked me from having access to records. So if I can't have access to records, I can't prove I was or wasn't on probation. They won't give me anything. I actually have an e-mail here from Elisa Santiago, who works for the probation department. I have it right here. And I asked her for copies of my probation records. And this would state whether or not I was on probation or not. And she says right here that at first she said that she would give it to me if I sent a copy of my driver's license, which I did, and then she said, unfortunately, they can't give me copies of any records. These are my records that I'm entitled to. She said they won't give me copies of any records. So if I can't prove I'm on probation, if I can't prove I didn't commit these crimes, how can I sue? I was actually told by the board of pardon and parole, they actually said to me, you have no idea how many people are incarcerated who are actually innocent. And if you can't prove what you're saying, then you have no suit. So what I did was I asked them, okay, well, the state law says when you're exonerated, then you have two years from that time to sue. That's what the state law said. When you're exonerated slash pardoned, you have two years. So I asked them, what constitutes an exoneration? Because there's a difference between an exoneration and a pardon. They said to me, once a state official looks into your matter, and they determine that it was someone else's fault other than your own fault, then you are officially exonerated. You have two years from that point to file a suit. So I filed the claims commission suit. This was in 2019 because I started to get documents. See here, I have a lot of documents that I've been collecting over the years. And I filed a claim in 2019. The state's attorney, William Tong, said he believed the manager of the police department is responsible for my incarceration, not the prosecutors, not the judge. At that time, I was exonerated. He said it was not my fault. It was the fault of the manager of the police department. I don't want to cut you off, but we obviously have your papers, too, and we appreciate you coming in and giving us the background to the case. So we're going to reserve the decision. I appreciate you coming in. Thank you. You don't need any? No, we understand that you obtain these documents later on, so that's not a dispute. It's just whether or not the statute of limitations applies. So if we need those documents, we'll let you know. Okay? Okay. All right. Thank you. All right. The last case being argued today is Thompson v. Steinberg. All right. Mr. Steinberg, I see you reserved three minutes for rebuttal. And you can begin whenever you're ready. Your Honor, before we start, I want to point out I have two motions. Well, first of all, Mr. Proctor, when you came in late, we expect you to come in on time. It's not acceptable to say I'm on the bridge. Everybody budgets in sufficient time to get here at 10 a.m. So that's your first problem. Whatever motions you have, you can address when you get up there. It's Mr. Steinberg's time. Okay? Okay. Okay. Go ahead. Thank you. Good morning. Excuse me. The appeal is a fairly narrow issue as to whether or not Mr. Paukman acted sufficiently to invoke the safe harbor under Rule 11. The district court ruled that a motion, a letter motion that Mr. Paukman filed that the court rejected and denied, explaining that it was incomplete, does not have a clear purpose, and does not seek relief from the court. The court ultimately ruled that because of that letter motion, Mr. Paukman had invoked the safe harbor provision of Rule 11. What do you think the test for withdrawal should be? Well, I believe ultimately the question is, was it necessary to make this motion? Was it necessary to, was there still a case pending? Yeah, I think that really is the issue. I think you hit it right on the head. First of all, it was mislabeled on ECF as a motion to consolidate. And as Judge Engelmeyer pointed out when he ultimately denied the sanctions, the substance of the letter was unequivocal. This letter motion is to withdraw document number one without prejudice. So if this had been labeled properly, notice to voluntary dismiss on ECF, nothing else had to be done. It was just because it was mislabeled that Judge Engelmeyer didn't understand it that way at the time. Am I understanding the situation correctly? There was nothing else that needed to be done. They didn't need a stipulation. I know there were emails back and forth about a stipulation. There was no stipulation necessary. This certainly is an unequivocal statement. I want to withdraw without prejudice my case, right? Correct. And he pointed out, and you can correct me if I'm wrong, you say the judge terminated the motion. But if you look on ECF, it actually looks like the clerk of the court terminated the case on that date, potentially construing this as a voluntary dismissal, which doesn't need a judge's authorization. And the court's office actually terminated the case, and Judge Engelmeyer, I think his argument, Judge Engelmeyer dismissed it again in denying the motions. But it was already gone on the court's docket. What's your response to that? Certainly neither the parties nor Judge Engelmeyer understood that the case had been dismissed as of that date. But he kept telling you, well, there were two things going on, I think, in the emails back and forth. One is, I think it's his view that nothing else needed to be done. You had an email with him where you said we want with prejudice. Sure. And then there was this back and forth. I want discovery. I want a settlement. But that's a whole different can of worms. If, in fact, and I understand why you were concerned, you wanted some type of something more, which would be a dismissal with prejudice, certainly he was free to negotiate that with you, right? I was willing to do anything. I think my emails were fairly clear. I was willing to do anything short of having to make a motion to the court. That wasn't him. First of all, he never did anything with the court. But I don't know if that's him going back on his dismissal without prejudice. I think his view was I've withdrawn that case. I don't need to do anything else. To the extent you want something more, which is a dismissal with prejudice, let's negotiate, right? Sure. So what's wrong with that? Again, this is a very narrow issue of whether or not I understand the whole history and the behavior. But on the issue of whether or not he somehow didn't do everything he could to, in the safe harbor period, withdraw the case, what more could he have done other than properly label it? Well, when the court denied the motion, and the court, that's what happened. The fact of the matter is that- The court didn't say, I'm denying this, you didn't properly label this, put in something else. It was, I mean, you can interpret the last line of the court's order on that date was, except in the event of new developments mirroring the court's intervention, the court does not see a cause for further correspondence in these matters. It almost seems like the court is suggesting that it's the same thing in the criminal case. Like, this is over. There's nothing more to do here. So even though Judge Engelmeyer didn't say, and I dismiss the case, there's nothing in Judge Engelmeyer's order suggesting that Mr. Patham has to do something else beyond what he did, right? I understand that that's why we're looking at it in hindsight. But at the time, certainly my understanding, my reading of the judge's order was that because the case could be withdrawn unilaterally by Mr. Palkman, there was nothing for the court to do. That's certainly the way I understood it. And if you read the e-mails that I wrote to Mr. Palkman, I essentially said that. The court's not going to do this for you. You have to do it yourself. Now, I understand there is the entry on the docket that you're referring to about when the case was marked. I guess the expression is terminated, which I'm not sure that's really the same as a dismissal. But it's also not a complaint. It's a very unusual document. It's a termination of a miscellaneous case that was initiated by the filing of the letter. Correct. So, I mean, I suppose you could have sought striking of the letter, but ultimately what you wanted was termination of the case. I wanted it dismissed. I wanted all of the allegations against me. I want it clear that none of that was there was any basis. On January 21st, the same day, 1253 p.m., you end the e-mail saying, I am asking you to dismiss it with prejudice because I don't want this filed again and have to go through this another time. So my understanding is that, and then, again, he starts talking about reasonable settlement and getting discovery. So it seems like that's what you were looking for at that point, right? There is no question that my initial strategy was to see if I could get Mr. Palkman to agree to dismiss this with prejudice. Absolutely. When he wouldn't do that, however, and after the court issued its order terminating that motion, I backed off from that. And I led Mr. Palkman to the point where he could file the notice of dismissal. And that would be without prejudice.  Is it possible you just misunderstood that the case was in fact terminated and over and you just didn't notice? It's very easy not to notice that on the top of the docket. I didn't notice it until yesterday. Exactly. None of us noticed it at the time. In fact, that argument has never been made until the motion that Mr. Palkman just filed. No one's argued that. Judge Engelmeyer didn't say it was withdrawn. Correct. Because the case is terminated. Correct. And Mr. Palkman never argued that at the time. He didn't argue it in his briefs to this court either. That's something that we've just become aware of. The other thing I wanted to just take a second to address. Even if we would agree with you, Judge Engelmeyer still, it's in his discretion, even if this technically did not comply, he could still say it was an attempt. And in my discretion, I'm not going to impose the sanctions anywhere, anyway. So isn't that really, either way, he views this as sufficient to avoid the sanctions whether or not, and that's within his discretion, right?  But, but, I take his decision at face value, which is that the... He made a legal decision. It wasn't, it was withdrawn. And he said he could not proceed. And by my view of this, when I received the decision, my reaction was, wait a second. He found that it was frivolous conduct. I read it differently. I said if he hadn't tried to do this, then I would have sanctioned him for all these things. I suppose he could have said whether or not it's withdrawn because of the efforts made to withdraw it that I misunderstood. I won't, in my discretion, impose sanctions. That's not what he said. What he said was it was withdrawn. If it hadn't been, I would have exercised my discretion. I would have the ability to impose sanctions, and I would. I think the judge may have felt some responsibility for not having discerned from that letter motion what counsel was requesting. There were, there had been, I understand there's lots of letters from Mr. Paufman like that one. And I think the judge was frustrated with that. But my point is that what happened, happened. And it is ultimately the responsibility under Rule 11 for counsel to correct their frivolous conduct. And that didn't happen here. Notwithstanding all of the emails that I wrote and all of my effort to actually show Mr. Paufman exactly what needed to be filed for this to be finished. So that's why I felt that it was an appropriate appeal. Thank you. All right, Mr. Paufman, you're up. Hi, good morning. Okay, so yeah, I'd like to just point out that If you wish to, you can remove your mask. Huh? Exactly. If you wish to, you may remove your mask while you're arguing. You can't hear me with this? It's up to you. Oh, okay. I'll try and talk like this if you can't hear me. That's fine. Because I have like a sore throat. I don't want to get anyone sick. I'm not saying I have anything, but I don't want to. No, no. I just want you to know that you're free. And plus, I think he has a sore throat. Okay. So, yeah, basically, I just want to point out a case. Retail Flooring Dealers v. Berlioz. I put that in. Well, first, I want to argue my motion to dismiss. The reason his appeal should be dismissed is because he's saying to me, You need to dismiss this with prejudice. I said, No, I can't do that. I'll dismiss it. He's like, No, no, with prejudice. So I wrote a letter to the court. I'm saying I want to dismiss this. Two days after I wrote the letter to the court asking to dismiss this, the clerk terminated the case. So the case was already terminated. And I understand the judge was very frustrated with me because of motions I made on the criminal docket. So he was more frustrated because of the motions on the criminal docket than anything I said about Daniel Steinberg. The reason we've had, like, this bad exchange with Daniel Steinberg is he filed a motion against me. Well, in that, I'm sorry, he filed an action against me. In that action, if you look, you will see that the signatures of defendant are actually, the signatures of one of the parties are actually judgment that are forging signatures of his mother. Then he filed a grievance complaint against me. How many years have you been an attorney? Huh? How many years have you been an attorney? 20. 20. Have you ever voluntarily dismissed a case before? If I ever voluntarily dismissed a case? Yeah, don't you, it's pretty basic that if you want to voluntarily dismiss the case, you put notice of voluntary dismissal, that's what it is, and you say, I voluntarily dismissed the case. Why didn't you do that here? That's what the whole cause of confusion was. There's a lot else going on here around the issue before us. Yeah. That's what happened. You didn't call it a voluntary notice of dismissal, and therefore it was not construed that way by at least Judge Engelmeyer. Okay, I'll explain to you what happened. Mr. Steinberg filed a motion for contempt against me in Kings County. So because he already filed a motion for contempt in Kings County, there was an order by Judge Pauly saying that from now on, any motions you make, you have to pay the $45 filing fee. So I didn't want to just file the motion on the criminal docket and then have this guy file another contempt of court motion. So that's why it was a little bit difficult for me because the judge already ruled on this motion on the criminal docket, and the only reason I was filing it was to pay $45 not to have another contempt motion against me. So, I mean, all I'm really trying to do is I'm trying to enforce a judgment for the past seven years, I haven't made any money. This guy's made hundreds of thousands of dollars because I actually have the checks. I'm just trying to make a living. I'm just trying to put some food in my stomach, you know, that's it. And the only reason I'm going after this guy, Aaron Braunstein, is because he owns half of Brooklyn. So he has attorneys, you know, paying them hundreds of thousands of dollars to attack me. But to make a long story short, I told Daniel, if you look at one of my motions, I said to him as far back as June 4th, 2020, you can disregard this because this motion was filed on the criminal docket. And because of Rule 11, because it says that I have a 21-day period, I filed a letter saying I want to withdraw the case. The clerk saw it and withdrew it three days later. He terminated the case three days after my motion. And that's it. Did you ever tell Mr. Steinberg that? I don't remember seeing the e-mails you were saying, this case has already been terminated, book on the docket. I don't remember you saying that to him. There was no use to tell him that because he was- When you have all these back and forths about what needs to be done, he's saying I need a stipulation. If you had noticed that at the time, you wouldn't say to him, what are you talking about? This case is over. Well, he should know the case is over because the motion's been decided on- You just didn't tell him that. You saw it at the time, but you didn't tell him that. Is that what you're telling us? No. You saw that it was terminated at the time, and you just decided not to tell him in all those e-mails, even though that was the whole topic? Well, first of all, the motion was decided December 20th. And he filed his Rule 11 letter two weeks later, three weeks later. So, no, no, that's not the case. The reason I didn't feel- Me and Mr. Steinberg was at a standpoint. He's not saying dismiss the case. He's saying dismiss it with prejudice. And I did say to him, I'm like, how can I dismiss a motion that's already been heard? There's no case law that allows me to dismiss a motion that's already been heard. There's none. Do you think it's appropriate for an attorney to file the same motions over and over again, or filing different lawsuits when there's already been a ruling? Huh? Do you think it's appropriate for you to have kept filing motions over and over again over the same thing, even when you lost, just arguing the same thing? Do you think that's something that an attorney, ethically, should be doing? Well, no, this is actually not the same motion. This was a motion that was filed in criminal court. And, Judge, it was just my insight at the time. If it was faulty, then it was faulty. But it was just a motion filed in criminal court. And it involved some parties where Judge Pauly- I put the decision on the docket. Judge Pauly said that you cannot file any more motions without paying the filing fee. And I just did it for Judge Pauly. That's it. I don't want to be accused of contempt of court. I even- In June 4th, I said to Mr. Steinberg, I said to him, you can disregard it. You want to dismiss it with prejudice? Dismiss it with prejudice. You want to seal the case? I'm not- I'm sorry. You want to dismiss it without prejudice? Let's dismiss it without prejudice. You want to seal the case? I'm not opposed. And that's it. Just- You have 21 days to correct this. And that's what I did. I corrected it. It was corrected within three days the case was terminated. And even if it wasn't terminated, I looked. There's no case law which allows me to withdraw a motion that's already been heard. I mean, I would love such a case law. There's a few motions which I filed, even in other cases, which I wish I never filed. And I would love to withdraw them. But I can't. I mean, how is it possible for me to withdraw a motion after it's been heard? But that's basically what Daniel Steinberg wanted me to do. I don't think there are any questions. Do you have anything else to add? No. One other thing I want to add is another- I have a motion to dismiss because inside his appeal, he puts irrelevant documents that have to do with a Kings County case. We have your papers on that. Okay. All right. Thank you. That's it. And just one last thing. I just want to point out. It's not that I was filing a lot of cases. It's that I was going to different areas and trying to enforce a $20 million judgment. So it's not actual cases that I've been filing. Thank you. Mr. Steinberg. You have three minutes in rebuttal. Thank you. Just a couple of brief comments. First of all, Mr. Pacman did not appeal from the district court's decision. So for that reason alone, we ought not to be engaging in a discussion of whether or not his conduct was frivolous. That part of the decision has not been appealed from. But it pains me to correct a couple of things. With respect to the $45 fee argument that Mr. Pacman raises, Judge Pauley's decision appears in page 119 of the appendix. It was a case that Mr. Pacman brought against Aaron Braunstein and others. And the judge expressed some concerns about that proceeding that was brought. But to the extent that that decision can be read, as Mr. Pacman suggests, and I don't think it can, Mr. Pacman proceeded to file this case against me and another attorney. So we made the affirmative step of adding two attorneys as defendants. He didn't need to do that if his $45 fee argument was valid. So I just think that that's an invention at this point. With respect to the statement that was made about contempt, Mr. Pacman is connecting, improperly connecting, a case in state court that he brought called Madigan v. Berkeley Capital. That's a record at 205 AD 3rd 900. That's the decision that holds Mr. Pacman in criminal contempt. It has nothing to do.